# Exhibit A

# SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Agreement") is entered into by and between: (a) Shaw Cablesystems G.P. ("Shaw"); and (b) the At Home General Unsecured Creditors' Liquidating Trust by and through its trustee, Frank Morrow (the "GUC Trustee") and Frank A. Morrow in his capacity as GUC Trustee. (The At Home General Unsecured Creditors' Liquidating Trust and the GUC Trustee will be referred to collectively as the "GUC Trust." The GUC Trust and Shaw may be referred to in this Agreement individually as "Party" and collectively as "Parties").

## RECITALS

A. On September 28, 2001, At Home Corporation ("At Home") and its affiliates (collectively the "Debtors") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "Bankruptcy Court"), Case No. 01-32495-TC (the "Bankruptcy Case"). On August 15, 2002, the Bankruptcy Court confirmed the At Home Debtors' Joint Chapter 11 Plan of Liquidation as amended (the "Plan"). The Bankruptcy Court subsequently declared the Effective Date of the Plan to be September 30, 2002.

B. On or about January 8, 2002, the Debtors instituted Adversary Proceeding No. 02-3005 against Shaw in the Bankruptcy Case (the "Adversary Proceeding"). Shaw disputed and denied all material allegations in the complaint filed in the Adversary Proceeding. On or about March 22, 2002, Shaw filed a counterclaim against At Home in the Adversary Proceeding. At Home disputed and denied all material allegations set forth in Shaw's counterclaim. (Collectively, the Adversary Proceeding and all claims, defenses and counterclaims of the Parties in that proceeding will be referred to as the "Litigation.").

C. On or about February 26, 2002, Shaw filed a general unsecured non-priority claim against the Debtors, which was claim number 602 (the "Proof of Claim"). The GUC Trust disputes the Proof of Claim and contends that it owes no amounts under the Proof of Claim. For purposes of this Agreement and the releases, covenants not to sue and the dismissals it contains, the Proof of Claim refers only to Shaw's class 5d claim as that term is defined in the Plan.

D. The GUC Trust has alleged (but not filed claims in the Litigation) that it has additional contract claims as well as tort and other claims against Shaw, including claims that Shaw and subsidiaries and affiliated entities (collectively the "Shaw Affiliates") have been and still are infringing, directly and/or in a contributory manner, and/or actively inducing the infringement of United States Patent No. 6,370,571 ("the '571 Patent"). Shaw denies any and all such claims, and specifically denies that the Shaw Affiliates have infringed the '571 Patent in any way or that the Shaw Affiliates have any liability with respect to such patent.

E. As more fully set forth in the Plan, the GUC Trust is a successor to the Debtors for the purpose of, *inter alia*, administering certain assets and causes of action distributed to the GUC Trust, resolving the allowable amounts of Class 5d claims, and making appropriate distributions to holders of Class 5d claims. Again as more fully set forth in the Plan, claims of the Debtors in the Adversary Proceeding and other claims of the Debtors against Shaw were assigned to the GUC

Trust.

F. To avoid further litigation and without admission of any liability, fact, claim or defense by any Party, the Parties mutually desire to settle, resolve and terminate all claims, counterclaims and disputes among them of any kind or nature, including without limitation claims arising out of or in any way related to the facts and circumstances related to the Adversary Proceeding, the Debtors' complaint and Shaw's counterclaim in such proceeding, Shaw's Proof of Claim and claims based on the '571 Patent or other intellectual property of the Debtors, on the terms set forth below.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties mutually agree as follows:

1. **Payment Of Settlement Amount:**

    1.1. <u>Payment</u>. Upon the execution of this Agreement by both Parties and upon the entry by the Bankruptcy Court of the Order provided for in paragraph 2 below, Shaw shall: (a) pay to the GUC Trust ███████████████████████████ by wire transfer of immediately available funds to an account designated by the GUC Trust; (b) deliver to the GUC Trust a promissory note in favor of the GUC Trust in the amount of ███████████████ in the form attached as Exhibit A (the "GUC Trust Note"); and (c) deliver to the law firm of Blakes Cassels & Graydon LLP in trust, for delivery to a San Francisco, California, office of Wells Fargo Bank, N.A., or such other banking institution mutually agreed upon by Shaw and the GUC Trust (the "Escrow Agent") upon execution of the Escrow Agreement described below, a promissory note in favor of the GUC Trust in the amount of ███████████████████████ in the form attached as Exhibit B (the "Escrow Note") (collectively, the "Payment").

    1.2. <u>Escrow Terms</u>. The Escrow Note, money delivered to the Escrow Agent pursuant to Section 1.3 and the Escrow Agreement and interest earned in the escrow account (collectively, the "Escrowed Property") will be held by the Escrow Agent pursuant to the terms of an escrow agreement that will be consistent with the terms of this Section 1.2 ("Escrow Agreement"). Shaw and the GUC Trust will exercise their commercially reasonable best efforts to enter into the Escrow Agreement with the Escrow Agent as soon as reasonably practicable, but in no event later than April 16, 2003. When finalized, the Escrow Agreement will be attached to this Agreement as Exhibit C. The Escrow Agreement will provide:

    1.2.1 Shaw will have the right to replace the Escrow Note at any time on or before September 15, 2003, by depositing with the Escrow Agent cash in an amount equal to the principal of and all outstanding interest on the Escrow Note (the "Replacement Cash"). Upon receipt of the Replacement Cash, the Escrow Agent will disburse the Escrow Note to Shaw and promptly notify the GUC Trust of such receipt and disbursement.

    1.2.2. Except as set forth in Section 1.2.1, the Escrowed Property will be disbursed only in accordance with the joint written instructions of Shaw and the GUC Trust,

which Shaw and the GUC Trust will provide in accordance with this Agreement, or by court order.

1.2.3. The Replacement Cash will be invested in an interest-bearing account in accordance with the parties' instructions and the Escrow Agent's business practices. All interest, income and other earnings upon any of the Escrowed Property will be disbursed with the Escrowed Property. The GUC Trust will be deemed the owner of the Escrowed Property for tax purposes.

1.2.4. Each party shall bear its own costs and expenses incurred in connection with the negotiation, drafting, execution and delivery of, and performance under the Escrow Agreement. Shaw and the GUC Trust will share equally all fees and costs of the Escrow Agent.

1.3. Shaw will deliver the Replacement Cash to the Escrow Agent on or before September 15, 2003. When Shaw makes that payment as required, Shaw's payment obligation under this Agreement will be fully satisfied.

1.4. If the At Home Bondholders' Liquidating Trust as established by the Plan has not filed any claims against any Shaw Released Parties (as defined below) (collectively, the "Bondholders' Claims") as of the end of the day of September 28, 2006 (the "Claims Expiration Date"), the Parties will give joint written instructions to the Escrow Agent to disburse the Escrowed Property to the GUC Trust.

1.5. If any Bondholders' Claims are filed against any Shaw Released Party prior to the Claims Expiration Date, the Parties will give joint written instructions to the Escrow Agent to deliver the Escrowed Property to Shaw, and Shaw shall have no further obligation to make the component of the Payment specified in paragraph 1.1(c) above. In the event the Escrowed Property is delivered to Shaw under this paragraph the GUC Trust will have no further liability to Shaw in connection with Bondholders' Claims.

1.6. At its option and expense, and subject to the Parties entering into a joint defense/common interest agreement, the GUC Trust may consult with and assist Shaw with the defense of any Bondholders' Claims for up to six months from the date of service of such Claims on Shaw. If such Claims are dismissed with prejudice within such six month period, and if such dismissal becomes a final, non-appealable judgment, then: (a) the GUC Trust will not forfeit the Escrowed Property based on the filing of the Bondholders' Claims as to which such judgment enters; and (b) the GUC Trust will reimburse Shaw's reasonable attorneys fees and expenses for such litigation, to be credited against and limited to the Escrowed Property. But such a final, non-appealable judgment dismissing some Bondholders' Claims will not entitle the GUC Trust to receive the Escrowed Property unless the Claims Expiration Period has passed as to all other possible Bondholders' Claims.

2. **Dismissal of Claims:** Shaw agrees that it will receive no distribution from the GUC Trust on its Proof of Claim. Concurrently with the execution of this Agreement, counsel for the Parties will execute a stipulation with proposed order, both in the form attached as Exhibit D, dismissing the Litigation (the "Stipulation and Order"). The Stipulation and Order

shall be filed with the Bankruptcy Court by counsel for the GUC Trust on April 8, 2003. If the Bankruptcy Court does not enter an Order, including all of the material terms set forth in Exhibit D (specifically including but not limited to paragraph 7 of the Order), this Agreement will not be effective.

    2.1.    Shaw will file an amendment to its Proof of Claim in the form attached as Exhibit E ("Claim Amendment"). The GUC Trust will not object to Shaw's Claim Amendment.

3. **Mutual Releases:**

    3.1.    <u>GUC Trust General Release</u>. The GUC Trust, for itself and as successor to the Debtors and for its and their respective successors and assigns (collectively, the "GUC Trust Releasing Parties"), release and forever discharge Shaw; its partners; its associates and affiliates as those terms are defined in the Canada Business Corporations Act; its and their respective officers, directors, employees, agents, attorneys, advisors, insurers, shareholders, managers, members and affiliates; all predecessors, successors and assigns of all such persons or entities; and any purchasers of substantially all the assets of any such partners, associates and affiliates (collectively, "the Shaw Released Parties") from any and all actions, causes of action, claims, demands, debts, liabilities, contracts, obligations, accounts, torts, costs and expenses, of every kind and nature whatsoever, whether known or unknown or suspected or unsuspected, whether fixed or contingent, whether accrued or unaccrued, which the GUC Trust Releasing Parties had, may now have, or in the future may have, directly or indirectly arising in whole or in part out of or in any way related to any transaction, matter, thing, occurrence, act, event or omission, including, without limitation: (a) any and all claims, defenses and allegations that were asserted or could have been asserted in the Litigation; (b) any and all claims, rights and interests of the Debtors preserved in the Plan and assigned or assignable to the GUC Trust by the Plan; (c) any claims otherwise related to the assets or liabilities of the Debtors assigned or assignable to the GUC Trust by the Plan; and (d) the intellectual property claims more specifically described in paragraph 3.2 below.

    3.2.    <u>GUC Trust Intellectual Property Release</u>. In addition to the general release in paragraph 3.1, and not in limitation of that release, the GUC Trust Releasing Parties release and forever discharge the Shaw Released Parties and their customers or other transferees from any and all actions, causes of action, claims, demands, debts, liabilities, contracts, obligations, accounts, torts, costs and expenses, of every kind and nature whatsoever, whether known or unknown or suspected or unsuspected by the releasing Party, whether fixed or contingent, whether accrued or unaccrued, which the GUC Trust Releasing Parties had, may now have, or in the future may have, directly or indirectly arising in whole or in part out of or in any way related to, any At Home Intellectual Property Rights, including without limitation any claims of infringement, contributory infringement or inducing infringement of any or all of the At Home Patents (collectively, "Intellectual Property Claims"). With respect to the release of customers and other transferees in this paragraph 3.2, the release extends only to Intellectual Property Claims that arise from products, services or assets provided to such customer or other transferee by Shaw.

    3.2.1.    "At Home Intellectual Property Rights" as used in this Agreement shall mean any proprietary right held at any time by the At Home Liquidating Trust or the GUC Trust under (i) patent law, (ii) copyright law, (iii) trademark law, (iv) design patent or industrial

design law, (v) semi-conductor chip or mask work law, (vi) all registrations issued under the aforementioned laws, including but not limited to the At Home Patents, copyright registrations, trademark registrations, industrial design registrations, and integrated circuit topography registrations, or (vii) any other statutory provision or common law principle which may provide a right in either ideas, formulae, algorithms, concepts, inventions or know-how generally including trade secret law or the expression of such ideas, formulae, algorithms, concepts, inventions or know-how.

   3.2.2. "At Home Patents" as used in this Agreement shall mean any and all patent applications and patents now issued or hereafter issuing, for any invention in which the GUC Trust or the At Home Liquidating Trust had, now has or hereafter has any ownership interest or enforcement rights whatsoever, anywhere in the world, whether or not such interest is currently held by the Debtors or the GUC Trust or any of them, including without limitation the '571 Patent.

   3.3. <u>Definition</u>. The claims released in paragraphs 3.1 and 3.2 may be referred to collectively in this Agreement as the "GUC Trust Released Claims."

   3.4. <u>Shaw General Release</u>. Shaw, for and on behalf of itself; its partners; its associates and affiliates as those terms are defined in the Canada Business Corporations Act; and its and their respective predecessors, successors and assigns (collectively, "Shaw Releasing Parties"), do hereby release and forever discharge the GUC Trust and its respective officers, directors, employees, agents, attorneys, advisors, insurers and all successors and assigns of all such persons or entities (collectively, "the GUC Trust Released Parties") from any and all actions, causes of action, claims, demands, debts, liabilities, contracts, obligations, accounts, torts, costs and expenses, of every kind and nature whatsoever, whether known or unknown or suspected or unsuspected, whether fixed or contingent, whether accrued or unaccrued, which the Shaw Releasing Parties had, may now have or in the future may have, directly or indirectly arising in whole or in part out of or in any way related to any transaction, matter, thing, occurrence, act, event or omission, including, without limitation: (a) any and all claims, defenses and allegations that were asserted or could have been asserted in the Litigation or pursuant to the Proof of Claim; (b) any liabilities of the Debtors assigned or assignable to the GUC Trust by the Plan (collectively, the "Shaw Released Claims").

   3.5. <u>Rights As To Unknown Claims</u>. The GUC Trust and Shaw acknowledge that they are familiar with California Civil Code section 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

In connection with the releases granted in this Agreement, the GUC Trust and Shaw expressly waive and relinquish any and all rights and benefits which they had, may now have or may in the future have under Section 1542 of the California Civil Code as well as any statute, rule, legal doctrine or common law principle of similar effect in this or any other jurisdiction, including Canada. The Parties understand and acknowledge the significance and consequence of

-5-

their waiver of Section 1542 of the California Civil Code as well as their waiver of any other statute or common law principle of similar effect in this or any other jurisdiction.

3.6. This Agreement, and the dismissals, releases and covenants not to sue and the agreement that Shaw will not receive any distribution on its Proof of Claim, all as contained or provided for in this Agreement, do not affect any rights of the Shaw Releasing Parties to assert rights of set-off, recoupment, or any similar defenses or counterclaims with respect to any claims or causes of action that may be asserted against them or any of them by any person or entity other than the GUC Trust (collectively, "Shaw Set-Off Rights"). The Parties expressly agree that the Shaw Releasing Parties retain all Shaw Set-Off Rights.

3.7. The releases and covenants not to sue in this Agreement do not release any rights or obligations arising from or under this Agreement and do not release any claim or action for, or bar any Party from bringing any claim or action for, breach of or to enforce this Agreement.

4. **Covenants Not To Sue**:

4.1.Ced Trust Covenant. The GUC Trust Releasing Parties covenant and agree that they will not commence, maintain, initiate or prosecute, or cause, encourage or assist any other person or entity to commence, maintain, initiate or prosecute, any action, suit, arbitration, proceeding or claim before any court or other tribunal (whether state, federal or otherwise) against any Shaw Released Party arising from, concerned with, or otherwise related to, in whole or in part, any of the GUC Trust Released Claims. Without limiting the generality of the foregoing, this covenant not to sue specifically includes any action, suit, arbitration, proceeding or claim arising from, concerned with or in any way relating to the At Home Intellectual Property Rights, including but not limited to the At Home Patents. Compliance with a subpoena or other court order to provide information relating to the GUC Trust Released Claims in an action brought by a third party shall not constitute a breach of this covenant. On receipt of such a subpoena or court order, the GUC Trust will give prompt notice to Shaw to enable Shaw to oppose or seek a protective order with respect to such subpoena or order.

4.2. Shaw Covenant. The Shaw Releasing Parties covenant and agree that they will not commence, maintain, initiate or prosecute, or cause, encourage or assist any other person or entity to commence, maintain, initiate or prosecute, any action, suit, arbitration, proceeding or claim before any court or other tribunal (whether state, federal or otherwise) against the GUC Trust arising from, concerned with, or otherwise related to, in whole or in part, any of the Shaw Released Claims. Without limiting the generality of the foregoing, this covenant not to sue specifically includes any action, suit, arbitration, proceeding or claim arising from, concerned with or in any way relating to the At Home Intellectual Property Rights, including but not limited to the At Home Patents. Compliance with a subpoena or other court order to provide information relating to the Shaw Released Claims in an action brought by a third party shall not constitute a breach of this covenant. On receipt of such a subpoena or court order, Shaw will give prompt notice to the GUC Trust to enable the GUC Trust to oppose or seek a protective order with respect to such subpoena or order

5. **At Home Intellectual Property Matters:**

   5.1. <u>License.</u> The GUC Trust will use its best efforts to have the At Home Liquidating Trust issue to Shaw, its partners, its associates and affiliates as those terms are defined in the Canada Business Corporations Act, its and their past, present and future subsidiaries, affiliates and controlled companies, and all their successors and assigns, a non-exclusive, perpetual, irrevocable, royalty-free, paid-up right and license under all At Home Intellectual Property Rights for all purposes throughout the world, including without limitation the non-exclusive rights and licenses to make, have made, use, sell, sell to others to be used by others, offer for sale, lease, otherwise dispose of, import and otherwise exploit and market products, methods and processes embodying any inventions covered by any and all of the At Home Patents for the full lives and terms of all such At Home Patents (collectively, "AHLT Licenses"). The AHLT Licenses should issue for no additional consideration, and should be fully assignable and sub-licensable, in whole or in part, by any of the licensed parties in connection with the sale or re-organization or other transfer or divestment of any part of the licensed parties' businesses. The GUC Trust's best efforts commitment under this paragraph will be to have the AHLT Licenses issue within ninety (90) days of the date of this Agreement.

   5.2. <u>Representations.</u> The GUC Trust represents and warrants that it has the exclusive right, privilege or ability to commence or maintain judicial proceedings, recover damages or obtain other remedies or relief to enforce rights in or related to the At Home Intellectual Property Rights, arising out of past, present or future, acts or events, including without limitation the right to commence actions for infringement, inducing infringement, or contributory infringement or otherwise enforce any of the At Home Patents (collectively, "Intellectual Property Litigation Rights"), except to the extent such Intellectual Property Litigation Rights is encompassed within the Controlling Shareholders Related Litigation as that term is used in the Plan. The GUC Trust further represents and warrants that the At Home Liquidating Trust, does not now have and will not have any such Intellectual Property Litigation Rights.

   5.3 <u>Non-Consent to Sale By Plan Agent</u>. The GUC Trust will not consent to any sale, assignment, license or other transfer of the At Home Intellectual Property Rights, or any interest in the At Home Intellectual Property Rights, by the At Home Liquidating Trust or the At Home Liquidating Trustee (collectively, the "Plan Agent") without the prior written consent of Shaw, unless such sale, assignment, license or other transfer includes a covenant not to sue the Shaw Released Parties as to any and all At Home Intellectual Property Rights in a form acceptable to Shaw, which acceptance shall not be unreasonably withheld.

   5.4 <u>Oppose Sale By Plan Agent</u>. If the Plan Agent provides notice to the GUC Trust of its intent to sell, assign, license or otherwise transfer any interest in the At Home Intellectual Property Rights ("Proposed Sale"), and if such Proposed Sale does not include a covenant not to sue the Shaw Released Parties as to any and all At Home Intellectual Property Rights to which covenant Shaw has consented with respect to such Proposed Sale, the GUC Trust will immediately give Shaw written notice of such Proposed Sale by facsimile and mail, and will take all steps necessary to object to and disagree with any such Proposed Sale unless the GUC Trust obtains Shaw's prior written consent to such Proposed Sale, which consent shall not be unreasonably withheld. If any mediation or judicial or other proceedings are instituted with

respect to a Proposed Sale, the GUC Trust will vigorously oppose and not consent to such Proposed Sale in such proceedings, will promptly give Shaw facsimile and written notice of such proceedings, will exercise its best efforts to enable Shaw to participate in such proceedings, and will cooperate with Shaw in all respects in any efforts Shaw wishes to take or have taken to oppose such Proposed Sale.

    5.5    <u>No Transfer By GUC Trust</u>. The GUC Trust will not sell, assign, license or otherwise transfer or permit the transfer by operation of law to any person or entity any part of the GUC Trust's Intellectual Property Litigation Rights unless such sale, assignment, license or other transfer includes explicit written acknowledgment and confirmation by the buyer, assignee, or other transferee that such person or entity is bound by the terms of this Agreement relating to the GUC Trust's releases, covenants not to sue, licenses, and other agreements with respect to At Home Intellectual Property Rights and Intellectual Property Litigation Rights. This paragraph does not preclude an agreement by the GUC Trust to settle claims against third parties arising from the At Home Intellectual Property Rights, as long as such settlement does not include a sale, assignment, license or transfer of any At Home Intellectual Property Rights or At Home Intellectual Property Litigation Rights. If the GUC Trust does want to include in such settlement a sale, assignment, license or transfer of any At Home Intellectual Property Rights or At Home Intellectual Property Litigation Rights, it must first obtain Shaw's consent to such sale, assignment, license or transfer, which consent shall not be unreasonably withheld. A covenant not to sue such a third party entered into in settlement of a claim arising from the At Home Intellectual Property Rights shall not in and of itself constitute such a sale, transfer, license or transfer.

    6.    **Subsequently Discovered Facts:** In entering into this Agreement and granting the releases and covenants not to sue set out above, the Parties acknowledge that they may hereafter discover facts in addition to or different from those which they now believe to be true with respect to the subject matter of the disputes and other matters addressed and released in this Agreement, but agree that they have taken that possibility into account in reaching this Agreement. The releases, covenants not to sue and other terms of this Agreement shall be and remain in effect as full and complete releases and covenants notwithstanding the discovery or existence of any such additional or different facts.

    7.    **Opportunity to Investigate:** The Parties to this Agreement acknowledge that they have had full opportunity to undertake all investigation and discovery they wished to undertake concerning the facts on which they base their decision to enter into this Agreement. The GUC Trust and Shaw understand and accept the risk that facts upon which they relied in entering into this Agreement may later turn out to other than true or different from the facts they believe to be true. The Agreement shall remain effective despite any such untruth or difference in such facts. Each Party represents that, in entering into this Agreement, it has not relied on any statements, representations, disclosures or legal opinions of the other party or its counsel, other than such matters as are explicitly set out in this Agreement.

    8.    **Confidentiality:** This Agreement and its terms and the negotiations leading to this Agreement shall remain confidential and shall not be disclosed to any person or entity not a Party to this Agreement; except that such matters may be disclosed only as necessary and only to the extent necessary: (a) by any Party to that Party's attorneys, auditors, accountants, tax

preparers, and taxing authorities; (b) as may be required by law; (c) in any action to enforce the terms of this Agreement; (d) to register a license if obtained pursuant to paragraph 5.1.; (e) to any person with the written consent of all Parties to this Agreement; or (f) if otherwise necessary to effectuate this Agreement, the Escrow Agreement, the Claim Amendment or the Stipulation and Order. If a Party is required by law or by regulatory or judicial order to disclose material made confidential by this paragraph, the Party obligated to make such disclosure will give notice to the other Party reasonably prior to making such disclosure and will cooperate in efforts to an obtain appropriate protective order.

9. **Independent Legal Advice:** Each Party represents that it has received independent advice from legal counsel of its own choosing with respect to the Bankruptcy Case, the Litigation, the terms and conditions of this Agreement and the advisability of entering into this Agreement. The Parties' counsel, by signing this Agreement approving it as to form, confirm this fact.

10. **Attorneys' Fees:** Each Party shall pay its own expenses, including legal fees and costs, incurred in connection with the Bankruptcy Case and the Litigation, and in connection with the negotiation, preparation and execution of this Agreement. However, if any action is necessary to enforce or interpret the terms of this Agreement, the prevailing Party in any such action (as determined by the court or other comparable authority) shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which the Party may be entitled.

11. **No Admissions:** The Parties agree that this Agreement is a compromise, satisfaction and accord of the Litigation and of actual and potential claims they have or may have. The Parties enter into this Agreement solely as a business decision for the purposes of settling all actual and potential disputes between them and to avoid the cost of further litigation with respect to such disputes. Nothing contained in this Agreement shall constitute or be treated or characterized as an admission by either Party of any fact or liability, or as evidence of any allegation of any Party. Nothing contained in this paragraph or in this Agreement shall be interpreted to restrict the right of any Party to bring a claim for breach of or to enforce this Agreement and to use this Agreement as evidence and proof of the fact of this Agreement and its terms.

12. **No Precedent:** The Parties enter into this Agreement as a compromise and with the specific understanding that it is without precedential value. By example only, but not as a limitation, this Agreement is neither intended to, nor shall it be construed as an interpretation of the '571 Patent or the value of the '571 Patent and shall not be used by any Party or any nonparty to this Agreement as evidence, or in any other manner, in any court, tribunal or other proceeding to create, prove, interpret or value the '571 Patent. The Parties agree that the claims and counterclaims asserted in the Adversary Proceeding, the claims by the GUC Trust referenced in Recital D, Shaw's Proof of Claim, the Releases, Covenants Not to Sue and other consideration encompassed by this Agreement each has substantial value.

13. **Warranty Of Authority To Execute And Perform The Agreement:**

13.1. Each person who signs this Agreement represents and warrants that the Party for which he or she is signing has taken all necessary corporate and legal action to approve

the making and performance of this Agreement, that he or she has been duly authorized and has the capacity to act on behalf of the Party for whom he or she is signing and to bind the Party and all who might claim through it to the terms of this Agreement.

13.2. Each Party represents and warrants that it (a) is the sole and lawful owner of all right, title, and interest in and to the claims it releases in this Agreement; and (b) has not assigned, transferred, or purported to assign or transfer, in whole or in part, any interest in any of the rights and claims that are the subject of this Agreement.

14. **No Modifications:** This Agreement cannot be amended or modified in any respect, except by an instrument in writing executed by all Parties.

15. **Choice of Law and Construction:** This Agreement and the Escrow Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of California and, where controlling, applicable United States federal law, except for the GUC Trust Note and the Escrow Note, which shall be interpreted, construed and enforced as their terms provide. All Parties have participated in drafting this Agreement and it shall not be construed against any Party on the basis of attributing its drafting to such Party or its counsel.

16. **Entire Agreement:** This Agreement, including its Exhibits, is an integrated agreement and contains the entire agreement between the Parties as to the subject matter. All prior oral and written agreements, if any, are expressly superseded by this Agreement and are of no further force and effect. The terms of this Agreement are contractual and not mere recitals.

17. **Counterparts:** This Agreement and its exhibits may be executed in counterparts, each of which will be deemed an original. Copies and/or facsimile transmittal signature pages may be used instead of originals. The executed counterparts shall be construed as and constitute one Agreement that will be binding on the Parties.

18. **Cooperation:** The Parties agree to and will cooperate fully with each other in the performance of this Agreement, and will execute such additional agreements, documents or other instruments as may reasonably be required to carry out the intent of the Agreement. This Agreement includes an obligation of good faith in its performance, construction and interpretation.

19. **Allocation of Payment:** The Parties acknowledge and agree that: substantially all of the Payment to be made under this Agreement is in satisfaction of the Debtors' and the GUC Trust's claim for fees payable under the Agreement between At Home Corporation and Shaw effective March 17, 1997 and all amendments and modifications to that (collectively "1997 Agreement") for the period July 1, 2001 – March 17, 2003 ("the Period") in respect of services provided in the U.S. by At Home Corporation. The Parties further agree that all fees previously paid under the 1997 Agreement were paid by Shaw and received by the Debtors in consideration of services, facilities, computer software, trademark use and other items (including the use of intellectual property) provided by Debtors under the 1997 Agreement, in the following proportions:

19.1. Providing use of At Home's computer software including, but not limited to software for: support and network management systems, service verification, client browsers,

application plug-ins, mail services, coaching, replication and proxy servers -- 20%;

        19.2.    Providing services in the U.S., including but not limited to: installing and maintaining routers, proxy servers, and RDCs; engineering operations; marketing and management consultation; training programs; technical support via telephone, electronic mail and automated exchange, and access to At Home's physical facilities located in the U.S., including but not limited to: backbone, telecommunications equipment, and interconnection hardware -- 74%;

        19.3.    Providing access to At Home's equipment in Canada, including but not limited to: mail servers and proxy servers – 0.9%;

        19.4.    Providing intangible rights and entitlements (*i.e.*, "other"), including, but not limited to, intellectual property -- 5%;

        19.5.    Providing use of trademarks owned by Debtors – 0.1%.

    20.    **Persons Bound and Benefited:** This Agreement binds and will inure to the benefit of the Parties and their respective predecessors, successors, assigns, affiliates and beneficiaries.

    21.    **Retained Jurisdiction:** The Parties agree that the Bankruptcy Court will retain jurisdiction over this Agreement for purposes of resolving any disputes that may arise in the future regarding this Agreement, the Escrow Agreement, the Claim Amendment and the Stipulation and Order, (but not the GUC Trust Note or the Escrow Note), their terms or their enforcement. This will not preclude a Party from asserting this Agreement in defense of claims brought against it in some other forum.

IN WITNESS WHEREOF, the Parties hereto have entered into the Agreement, to become effective upon its execution.

DATED: April ___, 2003

At Home General Unsecured Creditors' Liquidating Trust

By: _____
Frank Morrow

Its: Trustee

DATED: April _X_, 2003        Shaw Cablesystems, G.P.

                              By: _____
                              Its: _President_

                              By: _____
                              Its: _Vice-President Law & Senior Counsel_

*APPROVED AS TO FORM:*


McNUTT & LITTENEKER, LLP

_____
Rebecca U. Litteneker
Attorneys for Frank Morrow, Trustee of the
At Home General Unsecured Creditors' Liquidating Trust




SHERMAN & HOWARD L.L.C.


_____
Christopher Lane, Esq.
Attorneys for Shaw Cablesystems G.P.

-12-

DATED: April ___, 2003                Shaw Cablesystems, G.P.

                                      By:_____

                                      Its:_____


                                      By:_____

                                      Its:_____

*APPROVED AS TO FORM:*


McNUTT & LITTENEKER, LLP

_[signature]_

Rebecca U. Litteneker
Attorneys for Frank Morrow, Trustee of the
At Home General Unsecured Creditors' Liquidating Trust




SHERMAN & HOWARD L.L.C.

_[signature]_

Christopher Lane, Esq.
Attorneys for Shaw Cablesystems G.P.